130332, Bollinger Shipyards v. National Union Fire Insurance. Mr. Reich. May it please the Court. Robert Reich and Michael Wyzicki on behalf of Bollinger et al. It's uncontested, certain things. Louisiana law applies. It's uncontested that it's a contract case. This is a de novo review. It's uncontested that words are given their plain meaning, but policies must be interpreted in such a way to find coverage under Louisiana law. This case involves a claims-made policy, and it's kind of surely to understand the significance of a claims-made policy, and it's kind of set out in the Louisiana insurance guarantee case that we cited, but it kind of explains the difference and the reason why claims-made policies are important. You don't have to get in an argument about when the occurrence occurred. It's just did the claim occur, and that's the date that triggers. That's the event that's insured against, the claim is insured against. Now, the Court concluded that if the claim is the filing of a complaint, then this case is covered, and that's in the Court's decision. I'll give you the site in a second. I believe it's 1757. Okay, but in any event, so an underwriter is free to define any term any way he wants. The term we're dealing with here is claim, capital C, claim. The underwriter in this case defined the term capital C claim in the disjunctive. It was either A, a written demand, or B, a lawsuit. Clearly, if B is accepted, the Court said there's coverage. Because there is a disjunctive definition, the insured is free to choose whichever definition the insured wants, and the Court is required to use whichever definition results in coverage because you interpret a policy in such a way that there is coverage afforded. So if you look at the second definition and you substitute that. Are you talking about the definition of a civil, criminal, administrative, or arbitration proceeding commenced by service of a complaint? Yes. Is that what you're talking about? Yes, Your Honor. You're not drawing a distinction between a written demand for monetary versus a written demand for non-monetary relief? No, I'll get to that second, but I want to address the first thing. Because the definition of claim is defined in the disjunctive with or, we can choose either one. If we choose the second one and substitute that in on record page 2946, which is the policy, Provision 1A, the policy will read, This policy shall pay the loss arising from a civil complaint first made against such insurers during the policy period. We're covered. Using definition 2, the court has said, we're covered. And since it is in the disjunctive, and since you have to interpret it in such a way that there is coverage, there is coverage. You're covered from when? Well, we're covered from the date the complaint is filed. Okay, so that's 2011. Yes, Your Honor. Okay. In other words, because that's the claim. Now, let's look at the first definition because I do want to address the first definition too. The first definition says a written demand. Now, then it goes on and describes the type of written demands. Now, first, you have to understand that if the underwriters did not intend there to be two alternative acceptable definitions, they wouldn't have had to put the second definition in because a complaint is in writing. And a complaint is a written demand. Is this a common way to structure a claims made, the definition of a claim in a claims made policy? In my experience, Your Honor, this is not. In my experience, this is a different definition. If you look at all the reported cases, I can't find any reported case with this particular definition, the disjunctive definition. Okay. And I think that's important because the underwriters chose a disjunctive manner of doing it. But let's look at the tolling agreement aspect itself. The document does not contain a demand. In fact, the court found at record 1757, quote, tolling agreement indicates the United States, quote, was considering bringing a claim. Well, the language of number one says a written demand for non-monetary relief. Yes, and there's no relief. That's not a, well, letting us extend the statute of limitations is a, making you agree to that is relief. Well, Your Honor, I think a demand for relief means a relief for the wrongful act. In fact, if you look at where the policy goes on. Well, it is relief for the wrongful act if you get a couple more years to investigate before deciding whether to file it. If this were me in the IRS, I'd say they were getting substantial relief. What about punishment for false claims? Well, but again, if you look at the, if you look at what the written demand says, what the tolling agreement says is the United States just wants to have time to see whether or not it may have a claim. It would be like me saying to you, I think I might have a claim for damage to my car. Well, I understand very well because the IRS enters into, you know, tax, we've seen many cases where taxpayers enter into these deals with the IRS and all it does is put off the day of reckoning, so everybody knows that you are in the crosshairs when a tolling agreement is sought. Well, that would be true if you had just on taxes, but in this case, if you look at the tolling agreement, it's we may have a claim under and they list every other statute imaginable, including. The ships had failed or at least one of them had. But they mention not only the False Claims Act, but any other civil complaint. So it's contract. It's so vague, so I don't think it's a demand, but again, the burden of proving an exclusion is on the insurer. So the insurer has to show that this is a written demand. I think where the judge got hung up is the Perrin tolling agreement, close Perrin, and it's in parentheses in the definition, refers to writing, not demand. In other words, a written demand including da-da-da-da-da Perrin tolling agreement. But I think the tolling agreement still has to contain a demand for some relief. Frankly, I disagree with you grammatically. It says non-monetary relief and Perrin. There's a way in which non-monetary relief is defined, and that is including a tolling agreement. Well, this court, and I believe- As if that's a subset of non-monetary relief. Well, in this court, and I believe Judge Reveley was involved in that decision, the Federal Deposit Insurance Corporation, if you recall, there was a target letter that went out to the members of the bank. And, of course, the argument was that the target letter constituted a claim because you've got to know they're going to make a claim against you for your false, fraudulent acts and everything. And this court said that a target letter does not constitute a claim or a written demand. In fact, it cited a Sixth Circuit case, MGIC. And in MGIC, and I realize that's Sixth Circuit, but it said, quote, a claim that a wrongful act has occurred is not the same as a claim for payment on account of the wrongful act. So if the government's saying, I think you might have done something wrong, that's not the same as saying, I demand you pay me. All of this is somewhat mooted by, however, the continuity date argument. To me, the continuity date is really the key to the whole thing because continuity means just that, continuous. And if you look at the whole idea behind a claims-made policy, you've got to make a claim during the policy period. Okay, what the underwriter's saying is this policy period goes from 1998 through 2013 is where the last one was. And why? Because it's the same underwriter. It's the same underwriter year after year after year after year. So under a normal claims-made policy, at the end of the policy period, in this case, there's a discovery period, and it's one, two, or three years, depending, and they've got to present you with an option to purchase one, two, or three years. Well, in this case, they didn't give us the one, two, three-year option because it was the same underwriter year after year after year. And if you look at the actual certificate that is attached in the record, I'll give you the record site here. When I get back up, I left it there. But the certificate says this policy replaces the preceding policy, and every policy for the year before replaces, replaces, replaces. So what they're doing is they're telling you we have one continuous policy with AIG. So there is no issue as to when the claim arose. And if you look at the definition. Well, that would vitiate the claims-made requirement completely, wouldn't it? No, Your Honor, it would not because the claim still has to be made while AIG is on the risk. So AIG has been on the risk since 1998. What's your best case to support that interpretation of the continuity agreement? You know, Your Honor, there is no case that I could find anywhere addressing that continuity clause, and nor could counsel. Counsel pointed only. That either means it's totally obvious or it's totally frivolous. Well, what it means is I don't know of any policy that contains a continuity date clause. What it says is, if you look at the exclusion, if you look at their argument, they say, well, the only thing we can cite you to in the policy is exclusion 4E, I think it was. Well, if you read that exclusion, it says, any claim during this continuity date. Okay. Well, therefore, it says, unless the claim is made during the continuity date, there's no coverage. The implication is, therefore, if the claim is made during the continuity date, there's coverage. If there's no coverage for a claim made outside of the continuity date, then there's got to be coverage for the claim made inside the continuity date. And the fact that you have a continuity date in there means you have to be covering a claim if it's been made in that broad span. Unless it was already made in the prior span. What's that? I said unless it was already made. Unless it was already made, you're talking about. But it's the same underwriter. It's AIG. But it's not during the rub. The claim was made originally, whatever the total agreement is. Here's the thing. If I had a policy, and look at it this way, I have a policy instead of a one-year term on my policy, I have a policy that goes from 1998 to 2013. A claim made in 2008 is a claim made during the policy. That's what we have. We have a policy here that goes from 1998 to 2013. If you consider the total agreement to be a claim, it was made during the policy period. So there's coverage because of the continuity date. Otherwise, you could say, well, then it has to fall on the 2008 policy. That's AIG. It's the same company. So what you would have to do then if AIG was intending this not to be a continuous policy, what they would have to do after every year, they would have to issue a tail, and you'd have overlapping tails so that then you'd report if you had a three-year tail on each policy, you'd have a report that would be covered by three policies because the policy would fall within the tail. Because remember, if the claim arises during the discovery period, it's covered by the policy. So now you've got three-year overlap, and you'd have one claim made in the discovery period covered by three different policies. That's why they had it as a continuous policy. That's the logical explanation for why AIG chose to use it as a continuous policy. Can you help me with your first argument? Your first argument is that because it's in the alternative, B-2, says a civil criminal initial rating claim or non-monetary relief. If you said because it's in the disjunctive, you could do either, but that constitutes a claim. Okay. I don't understand why that's relevant because we're only concerned about when the claim is first made. Okay. And it doesn't matter which method, which one is the claim. We're only concerned about when the claim is first made. Yes, Your Honor, but it's the definition of claim. And claim is defined as lawsuit. When was the lawsuit first made? When was the lawsuit first filed? 2011. Because you used definition 2 for claim, equal lawsuit, the claim was first made in 2011. Why? Because I, because. Definition 2 includes non-monetary relief. No, definition 2 says lawsuit. It means 142. You got claim on record 2947. But it doesn't matter if it's. 2947. It's already covered in number one. Well, but they're saying if claim is defined by number one, then it was made in 2008. I'm saying claim is defined by number two. Could a claim be defined by both? Your Honor, to answer your question, and again, with ambiguities construed against the insured, it's the same underwriter. It's the same claim. As long as it's defined to have coverage. So what, I mean, let me just, that was a friendly question. But if you took the events in 2008 as falling within subsection 1 as a non-monetary relief, that's a claim. Yes. And then you take the events when the lawsuit is filed as another claim. Yes. No, it's the same. Oh, another claim, yes. I'm trying to help you out. I understand. I agree. A separate claim because the lawsuit is unequivocal. What I'm saying is that by these terms, you can construe this as two different claims. One of them, the tolling agreement, an incident, a claim of non-monetary relief, and then the civil action, whether you consider that under, as a demand for monetary relief, or the lawsuit as a second claim. So you are covered from at least the filing of the lawsuit forward. I agree, Your Honor. You agree, but. No, but I think that's what you have to do because of the fact that you have to construe a policy in favor of coverage. When you get back in here, can you give me any citation to any case where the same party has to make multiple claims for the same incident using this theory that has just been outlined? Okay. I want to know of any case ever that's ever done that for the same party. Okay? Counsel, all Mr. Friday has to do is tell somebody that's got this investigation hanging on them and which they are always aware of and very nervous about is get a new policy. Get a new policy. Don't tell the insurance company, but you just get a new policy. That's a very good point. If they don't get a written demand, they'll have to be defended. That's a very good point. That's a friendly question. You understand. I do because what happened here. I'm Robert David. I represent National Union, and I want to address everything that the court has raised because there's no basis whatsoever in the policy for what has been espoused before you today. Not to mention there's no basis in any case law for it either. All of this happened in 2008 and before. Bollinger was under investigation. Bollinger is asking you to award defense costs to it, not from after the lawsuit. If you look at the briefs, they're asking for defense costs from the beginning this all started, this problem with the Department of Justice. That's several million dollars, right? Several million dollars. But you don't dispute that the insurance companies are liable after 2011? Oh, absolutely I do. Absolutely. This is a claims made and reported policy. As Judge Elrod just said, the issue is when was the claim first made? The claim as defined in the insuring agreement, which Bollinger bears the burden under Louisiana law of proving. I'm not arguing an exclusion here. I'm arguing Bollinger can't meet its requirements to prove coverage under the insuring agreement, which the Louisiana Supreme Court says is their burden. It is their burden to prove that a claim is first made. First made is the critical language here. It has to be first made during the policy. So what my able opponent is telling you is the claim, the 2008 tolling agreement, you can just ignore that. We can ignore that and we can ignore the language in the policy that says the claim has to be first made during the policy period. And we get to pick the lawsuit. The lawsuit is a direct result of the tolling agreement. The tolling agreement is very clear that it relates to the Deepwater Conversion Project. It is very clear that the United States is asserting claims for fraud, claims under equity, and claims under the common law. So what Bollinger is asking you to do is, oh, let us ignore the fact that we're undergoing this investigation. Let us ignore the fact that we're expending millions of dollars in attorney's freedoms from 2011. And we're going to buy a policy in March 2011. And you've got to pay for all our defense costs even though this has been going on for years. That's simply not how claims made in reported policies work. The claim in this case was not first made during the policy period. Claim is defined as a tolling agreement or a lawsuit. And, yes, they are disjunctive. And every claims made in reported policy reads the same way. There are different ways you can have a claim. The claim is when you know about the dispute. So Bollinger knew about this dispute in 2011. Did they have a policy in 2008 that they could have reported it under? Yes, they did. It was not with National Union. It was with another insurance company. But this lawsuit only involves a lawsuit under this one policy. If you read the complaint, if you read Bollinger's briefings, it relates to only one policy. It was not until after Judge Vance said this claim was not first made during this policy and after Bollinger filed a motion for a new trial that Bollinger came forward with this continuity date, discovery period, multiple insurance policies all lumped together theory. You cannot amend a complaint in an opposition to the granting of a summary judgment. Elementary federal code of civil procedure, it's not how it's done. So what Bollinger, this is not in the record, what Bollinger did after it found out that it was in trouble on this policy, it is it has gone back and filed lawsuits under the old policies. Those are the subjects of motions for summary judgment in the lower court right now. But this case, what we're here before you today on, is only the 2011-2012 policy. The claim was not first made during that policy. The claim was made in 2008. It's very clear under the definition of claim. Now, you asked if Bollinger has any cases to support its position about this. We get to pick whenever the claim happens, even in a claims-made policy that requires it at first be made during the policy period. There are none. We've cited to you the Precis case, the specialty food cases from the Fifth Circuit, not to mention the 2014 Louisiana Supreme Court decision in Gorman, which is very, very clear that claims made in reported policies are to be strictly construed. And in Gorman, there were successive policies by the same insurer, just like what Bollinger is arguing right here. And what the Louisiana Supreme Court said in July of last year is if a claim is made in one policy but it's not reported until the next, there is no coverage under the next policy, under the second policy, because the language of the policy is very clear. The claim has to be first made and reported in the same policy period. So here, contrary to the argument that now the policy period is 2008 to 2013, there's no basis in the policy for that, and it's clearly contrary to what the Supreme Court just said in Gorman. Prior to Gorman, the Supreme Court again confirmed the strict need to follow the terms of claims first made policies in the Hood v. Cotter decision. That's also submitted to you. The tolling agreement and the lawsuit are not two different things. They all arise from the same underlying facts, the same course of conduct, and they allege the same things. If the claim was first made in 2008, then why do you agree to defend following 2011? I do not. Oh, I thought you said that the company is liable. No, ma'am. No, ma'am. The company is not liable at all because the claim was not first made in the policy period. The claim was first made in 2008. Therefore, there is no obligation for any defense cost. The policy, Your Honor, says that the insurer will only pay loss arising from a claim first made in the policy period. Well, that's what I asked you that, and I got this other answer, so that's why I was trying to clarify. I'm sorry if I misstated anything, but there is no obligation whatsoever because the claim was not first made during the policy period. It was not. Is the Postal Council really arguing that you get a V-1 claim and a V-2 claim? Yeah, well, they've argued all sorts of things. They've even tried to argue that the tolling agreement only addresses non-covered claims, and therefore it's not really a claim. Well, I know that, and that doesn't work. Right. Did you get two claims just because there are multiple ways to define claims? No. That's what they're arguing? That is exactly what they're arguing, and there's no basis in the policy whatsoever to say the insurer gets to pick when a claim occurs. That's not the bargain for scope of coverage. The claim is defined as a tolling agreement or a demand for monetary relief or a lawsuit, and if you think about it, that makes sense. We're providing coverage, so when you get any type of a claim, your coverage can be triggered provided it's made during the policy period and you report it to us. That's what claims-made policies are designed to do is you have to make the claim during the policy period, and you have to report it to us as soon as practical. Why? Because insurers want to know when the dispute started. They want to know when the claim happened so they can set reserves, so they can participate in the investigation, so they can advance defense costs. Claims-made policies are not designed that an insurer gets to say, oh, well, we had this thing happen back in 2008, but we're not going to report it to anybody. We're going to spend a few million dollars and wait a few years, then we'll go buy some insurance, and then we're going to tell you about it. That's not what claims-made and reported insurance is all about. Can you address the continuity date? I sure can. Surely. All right. The continuity date, just initially, as I mentioned before, was not raised in the original motion for summary judgment. It was raised for the first time in a Rule 60 motion to alter or amend for a new trial. The original motion said that the claim was first made in the 2011-2012 policy, and now, realizing they were in trouble on it, they tried to go back. So a continuity date is wholly distinct from the policy period. Policy period is defined in the policy, March 1, 2011 to March 1, 2012. The continuity date is utilized in one exclusion, 4E, of the policy. The Fifth Circuit and Louisiana case law have said that exclusionary language cannot be used to create coverage where it doesn't otherwise exist. So if a claim is not first made in a policy period, you never get to the exclusion that contains the continuity date. You never get there. So the continuity date is really not in play. And the continuity date is that exclusion is a fairly common exclusion because while claims made policies are willing to cover wrongful acts that may have occurred before the policy incepted, they want to set a cutoff date for that. They're not willing to go back and cover wrongful acts that may have occurred beyond whatever, five years before the policy. So they set a time frame. And that's what the continuity date is. It's saying wrongful acts after the continuity date may be covered, provided the claim is first made and reported during the policy period. In other words, if a claim is first made and reported,  because if the wrongful act concerns acts prior to the continuity date, those are excluded. That's what's covered in the exclusion. The same thing goes for that discovery period. I won't spend much time on it. It's really of no moment. It's an extended reporting period, which requires a payment of an additional premium after a policy is canceled or not renewed. There's no evidence there was any cancellation of this policy or a non-renewal. In any event, Bollinger's provided no explanation as to how a discovery period after a policy that expired in 2012 could ever provide coverage for a claim that was first made in 2008, three years before the policy ever incepted. I believe I touched on this briefly, but this whole successive policy thing, argument, and multiple policies and all of that stuff really is of no moment here today. This lawsuit is only about one policy, the 2011-2012 policy. And as I mentioned to you, even if the other policies were before the court, under the Gorman decision it wouldn't matter because the claims have to be first made and reported. I think I have covered just about everything. Unless you'd like me to talk about the penalties element of it, that's what I said in my brief is pretty straightforward. And with respect to the arguments in the briefing that there's a duty to defend, this is not a duty to defend policy. The duty to defend is a contractual obligation. This policy expressly says that National Union did not assume a duty to defend. A defense could have been tendered if it was tendered within 30 days that the claim was first made. The claim was first made in 2008, long before this policy ever even incepted, so there is no obligation to pay any defense costs. In any event, defense costs are only covered as an element of loss, and loss only applies to claims first made during the policy period. Finally, not only do I represent National Union, I represent Chartist Claims. Chartist Claims is a claims administrator. Chartist Claims is not an insurer. Chartist Claims had no contractual privity with Bollinger, so there can be no liability for them either. So with that said, if you don't have any more questions, I'm finished asking. Thank you. I'd like to first address the issue about the continuity date having been raised. Keep in mind procedurally what occurred. We filed a motion for summary judgment, which was denied. That is not what we are appealing here. The judge then said, if you can indicate why I shouldn't grant judgment in favor of AIG, then do so, otherwise I'm going to grant judgment. AIG then filed their motion for summary judgment. We brought it up in opposition to their motion for summary judgment. It is properly before the court, because the issue that is being addressed by this court is the granting of National Union's motion for summary judgment, and we raised that issue in our opposition to that. We also raised it in our motion for new trial, but we raised it in our opposition to National Union's motion for summary judgment. So that is properly before the court. And by the way, to answer your other question, Judge Vance, in fact, said she couldn't find any case on point. We can't find any case on point. Addressing this specific policy. So there was an oral argument on this one? I don't think there was, Your Honor. I didn't think so. I don't think there was. Now, very quickly. Everybody agrees, I think, that if, and there are claims made policies which define claim as the filing of a lawsuit. If this policy had said claim is defined, capital C claim is defined as a lawsuit, nobody disputes we'd be covered. Because the capital C claim arose in 2011. Now, this definition says capital C claim is defined as a civil proceeding. It's clearly their definition. If they wanted to say, I don't want you to use both, they could have had only one without the disjunctive. They could have included that. They could have said claim is defined as the first of which, the first of these. They didn't say that. What they said is claim is defined by us as, among other things, a civil proceeding. And that's what we have here. Now, to address your question, well, maybe they should have put the underwriters on notice. I don't think anybody disputes that a claim for fraud and dishonesty is not covered by this policy. There are certain things that are covered by this policy, but a claim for fraud is not. Well, anything under the common law was part of the tolling agreement. That's true. But so is all of our insurance companies. And the False Claims Act actually can routinely often involve fraud or dishonesty. Right. So then the suggestion then was, well, if the government says they're thinking about a claim, Bollinger, you need to put every underwriter you've got on notice, even though a lawsuit hadn't been filed and even though no proceeding's been filed and even though the government hadn't even told you that they concluded you did anything wrong and even though the government hadn't asked you to do anything to correct it, just because the government wants to think about possibly filing a claim, you put all your underwriters on notice. Well, what would have been the downside of doing that? Well, the downside to doing that, Your Honor, is that Bollinger was trying to resolve this on a business basis and you interject some new blood into it that interferes with that business relationship and forces the government to file because the government. Well, if they don't have a duty to defend, why is the way they're being interjected? Because our underwriters may say, we don't want you to give a totaling agreement. You fight it out now with the government. And then where are we? Okay. We were hoping to get this thing resolved. And by the way, in another hearing on another policy, Judge Vance applauded Bollinger for their efforts to try to resolve the thing, thought it was a very good idea. But you took a risk. What's that? You took a risk. Well. Well, Your Honor, no, because we have one underwriter. Look, there's no doubt, following along on that argument, there's no doubt that if the claim is 2008, then the underwriter in 2008 is going to step up to the bat. Well, guess who that is? Same people. And that's why I refer you to the endorsement where we go to the next year. It says, this policy replaces steps in the place of. It doesn't say supplants. It says, we now step in the place. It's one continuous, one continuous policy. Well, you're turning a claims-made policy into some sort of notice policy. No, Your Honor. In fact, the whole idea, if you read the cases on claims-made policy, the idea behind that is that the written lawsuit is why the professional people can say, now I've got a claim against me because I've got a lawsuit. Every doctor gets a claim against him. Every doctor is accused. Every lawyer is accused of doing something wrong from time to time. The claim doesn't arise until somebody files a lawsuit against you, and then you tell your insurance company. All right, sir. Thank you. Thank you.